*In re* J.J.C., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. J.J.C., a Minor, Respondent-Appellant).

Second District    No. 2—96—1331

Opinion filed January 13, 1998.

Lance T. Jones, of Reid & Jones Law Offices, of Springfield, and James A. Borrasso, of Waukegan, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Gale C. Coil, of Sullivan, for the People.

JUSTICE HUTCHINSON delivered the opinion of the court:

Respondent, J.J.C., age 16, was adjudicated a delinquent minor after the trial court found him responsible for three counts of criminal sexual assault (720 ILCS 5/12—13(a)(1) (West 1996)). The trial court adjudged respondent to be a ward of the court and sentenced him to four years' incarceration and further ordered him to undergo psychiatric treatment and specific sex offender treatment. Respondent appeals, claiming that the trial court erred when it (1) denied his motion to suppress his confession statement, because the confession was neither voluntary nor knowing and intelligent, and (2) entered the order of adjudication because respondent was not found guilty beyond a reasonable doubt. We reverse and remand.

On June 27, 1996, respondent engaged in sexual relations with the victim, also a juvenile. Prior to trial, respondent moved to suppress statements he made at the time of his arrest. Respondent claimed that the law enforcement officials physically and psychologically coerced him into incriminating himself. Respondent also claimed that he did not fully understand his rights.

A hearing on respondent's motion to suppress was held on July 25, 1996. David Schwarz, a detective with the Highland Park police department, testified that, on June 27, 1996, he spoke with the victim after the alleged assault occurred. Because the trial court was focusing on the issue of probable cause, it allowed the following hearsay testimony. The victim related to Schwarz that she knew respondent from summer school, and while they were on their way home from school, they stopped at a video store. The victim's mother was outside, and the victim introduced respondent to the victim's mother. The victim and respondent proceeded to a bike trail, adjacent to railroad tracks. Respondent led the victim towards the railroad tracks, where

they engaged in consensual kissing. Schwarz then related that the victim stated that respondent forced her to engage in anal intercourse, forced her to engage in oral sex, and then forced her to have sexual intercourse with him.

Schwarz further testified that he and youth officer Steve Mueller spoke with respondent on June 27, 1996, at approximately 8 p.m. Schwarz read the *Miranda* warnings to respondent and stated that it appeared respondent was reading along. He testified that when he asked respondent whether he understood, respondent replied that he did. Schwarz also stated that he read two additional juvenile warnings, which respondent indicated that he understood. Schwarz testified that, after he read the juvenile warning which states that respondent could "consult with his parents or legal guardian before questioning," respondent replied, "it's none of their fucking business." Schwarz interpreted this to mean that respondent did not wish his parents to be present. Respondent looked at the sheet for $1^1/_2$ to 2 minutes and began to initial each warning paragraph. The sheet was dated and timed June 27, 1996, at 8:07 p.m. Schwarz also read to respondent a waiver of constitutional rights, which respondent signed at 8:09 p.m.

Schwarz further testified to respondent's version. He said that respondent attempted anal intercourse with the victim, but could not sustain an erection; respondent then had the victim put her mouth on his penis; he thought he was going to ejaculate, so he then entered her vaginally. After that, respondent told Schwarz, he heard a woman calling for the victim, so he ran away. Respondent agreed to put his statement in writing.

On cross-examination, Schwarz testified that he was unsure when he became aware that respondent's parents were at the police station, either after the interview or during the interview. He was aware that the parents were at their residence at approximately 7 p.m. when Officer Weaver, a Highland Park police officer, was there. When asked whether any conversation occurred regarding having respondent's parents present, separate and apart from the *Miranda* warnings, Schwarz replied there was not. He denied that respondent made a previous statement that had been thrown out.

The State's next witness was Detective Steve Mueller, a youth officer with the Highland Park police department. Mueller testified regarding his interviews with the victim and the hospital nurse attending the victim. He advised respondent of the report and the investigation; Schwarz then began to read the *Miranda* warnings to respondent. He stated that respondent appeared to understand the questions he was asked and seemed to respond appropriately. After

respondent finished writing the statement, Mueller met with respondent's parents and advised them of the investigation.

On cross-examination, Mueller testified to other informal contacts with respondent involving station adjustments, meeting and consulting with his parents, but none involving any referrals to juvenile court. He became aware of respondent's parents' presence at the station after respondent made an oral statement to the officers, but before respondent had completed the written statement.

Officer Carl Weaver, with the Highland Park police department, testified that he was on bike patrol when he received the dispatch call regarding respondent. He rode to respondent's residence, where he encountered the father and indicated to him that respondent was needed at the station by the investigators. Officer Weaver radioed the station and then informed the parents he would have to take respondent into custody. The officer put respondent in handcuffs and radioed for a patrol unit to transport respondent to the police station; Officer O'Neal transported respondent to the station. Weaver also advised the parents to go to the police station as soon as possible.

The defense called Dr. Leonard Carr, a child psychiatrist and a licensed physician, who was qualified as an expert witness. Dr. Carr testified that respondent had been his patient since October 1995. During his course of treatment with respondent, he diagnosed respondent as suffering from major depression with psychotic features, conduct disorder, and attention deficit hyperactivity disorder (ADHD). Dr. Carr stated that respondent is easily distracted and impulsive, making it difficult for him to understand and attend to directions given to him. He further stated that respondent was hearing voices and responding to stimuli not apparent to others, both visual and auditory hallucinations. Based upon his diagnosis, Dr. Carr implemented a treatment plan for respondent, which included Wellbutrin, an antidepressant medication, and Risperdol, an antipsychotic medication.

Approximately three months prior to the date of the hearing, respondent, on his own, ceased taking Risperdol and reduced his intake of Wellbutrin. During the time respondent was in the hospital as a result of the instant offense, Dr. Carr reexamined him and reclassified him as either having bipolar disorder or schizo-affective disorder, in addition to ADHD. Based upon his updated diagnosis, Dr. Carr prescribed to respondent Wellbutrin and Risperdol and added lithium carbonate, an antimanic medication. Dr. Carr opined that respondent's ability to comprehend and understand would have been detrimentally affected by his psychiatric disorders. He also opined that, when respondent was being interviewed by the law enforce-

ment officers in June 1996, respondent did not understand the concept of rights and warnings and relinquishing his rights based upon the warnings. Dr. Carr also stated that respondent would not have been able to understand the consequences of his behavior, even if the *Miranda* warnings were read and explained to him. Dr. Carr opined that respondent could not have freely or voluntarily relinquished his rights at the time of his interview.

On cross-examination, Dr. Carr testified that a person suffering from a psychotic situation could be able to speak clearly and unhesitantly. He stated that he based his opinion on his diagnosis, psychological testing, and his conversations with respondent. Dr. Carr described respondent as being intimidated by authority figures and believing that he could not resist them. When asked whether respondent's ability to comprehend would be increased if an instruction was read to him repeatedly, Dr. Carr responded no for two reasons: (1) that respondent's lowest abilities were reading comprehension and understanding, and (2) that respondent experiences hallucinations, confusing the ability to make appropriate judgments about the situation. Dr. Carr concluded by stating that respondent could not comprehend the true and real meaning of the *Miranda* warnings.

Respondent's mother testified that she was home on June 27, 1996, with respondent, when Weaver requested that she and her husband (the father) take respondent to the station for questioning and that Mueller wanted to speak with them. The mother witnessed Weaver conversing on the walkie-talkie and heard him say that respondent was in his custody. After his conversation, Weaver approached respondent and pulled his belt from his pants. The mother objected, stating that his pants would fall down. She also stated that, because he is a minor, she wanted to be with him when the officer took him to the police station. Weaver then put handcuffs on respondent. The mother testified that she again indicated to Weaver that respondent was a minor and requested to take respondent to the station or be with him. Her requests were denied.

After respondent left in the police vehicle, the mother returned to the house, and she and the father drove to the station. The mother stated that they arrived at the station at approximately 8 p.m. and the father informed the police officer at the window that they were there to see Mueller about respondent. The officer informed Mueller and directed the mother and father to wait. The mother testified that they waited an hour to an hour and a half before speaking with Mueller. When the mother requested to see respondent, Mueller told them no, that respondent had already read his *Miranda* warnings and had signed a statement.

On cross-examination, the mother testified that respondent attends special education classes at Highland Park high school and recently completed his sophomore year. She admitted that, when she was speaking with Weaver and indicated to him her desire to be with respondent, respondent did not indicate his desire to have her present.

Respondent's father testified next. He stated that on June 27, 1996, he was returning home from work and exercising and saw Weaver and his wife talking. When the father asked what was going on, Weaver replied that he did not have complete information, but that the mother and father should take respondent to the station for questioning by Mueller. The father asked whether he could shower first, and the officer indicated that he could. Within a matter of minutes, the father testified, the mother informed him that the police had handcuffed respondent and taken him to the station in a squad car.

Upon arriving at the station, the father requested to speak with Mueller. He saw the police officer telephone Mueller and inform him of their presence; they were directed to wait. Between 9:15 and 9:30 p.m., they spoke briefly with Mueller, who told them that respondent had made a statement and had signed the *Miranda* warnings. The father further testified that he was not allowed to see respondent the remainder of the day after the time he was taken into custody from their residence.

On cross-examination, the father testified that on two previous occasions he and the mother were present during a police interview with respondent. On those occasions, the mother simply told respondent to initial the *Miranda* warning paragraphs and write out a statement; respondent complied.

In rebuttal, Officer Tim Wilinski from the Highland Park police department testified to incidents occurring in June 1995 and in August 1995 involving respondent. He discussed the procedures used to read *Miranda* warnings to respondent and that subsequent to that respondent would initial each paragraph.

Mueller testified in rebuttal that he was not aware of the parents' presence at the station until approximately 8:45 p.m. He stated that the parents did not inform him of respondent's mental disabilities or respondent's ability to waive his rights. He stated that respondent did not request to see his parents, and once Mueller informed respondent of their presence, respondent purportedly told him "that he didn't want to meet with his parents because the incident was between himself, the police and this girl that was involved."

Weaver testified in rebuttal that he could not recall whether he

told the parents to take their time getting ready before going to the station on June 27, 1996. He testified that the mother never informed him that she wanted to be with respondent or that he was a minor.

After hearing arguments, the trial court found that respondent was experienced with police, criminal investigations, and *Miranda* warnings, stating that he had previously initialed and waived his rights on more than one occasion. The trial court further found that his parents were not prevented from seeing him, that there was no coercion, and that respondent's will was not overborne. The trial court determined that respondent did not want his parents present. The trial court also did not believe the expert's testimony regarding respondent's lack of understanding, but did find credible the testimony of the officers. Based upon these findings, the trial court denied respondent's motion to suppress.

Following a bench trial, the trial court found respondent committed the offense of criminal sexual assault and adjudicated him a delinquent minor. On October 17, 1996, the trial court denied respondent's motion to enter judgment notwithstanding the verdict. On October 24, 1996, the trial court denied respondent's motion to reconsider, and respondent timely appealed.

Respondent contends that the trial court erred by finding that his confession on June 27, 1996, was made knowingly and voluntarily. In support of his contention, respondent argues that he was interrogated without the presence of his parents, notwithstanding his parents' desire to confer with him and be with him at the station. Respondent also argues that Dr. Carr's testimony regarding respondent's mental capacity and mental disorders establishes that he could not have knowingly and intelligently waived his constitutional rights.

■ Persons subjected to custodial police interrogation regarding matters that might tend to incriminate them are entitled to the procedural safeguards outlined in *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). Specifically, they must be warned, prior to questioning, that they have a right to remain silent, that any statement made may be used as evidence against them, and that they have a right to counsel, either retained or appointed. These rights may be waived, if the waiver is made knowingly and intelligently. *Miranda*, 384 U.S. at 475, 16 L. Ed. 2d at 724, 86 S. Ct. at 1628. The determination of whether an intelligent waiver of the right to counsel has been made must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused. *Johnson v. Zerbst*, 304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, 1023 (1938).

Juvenile defendants are also protected by the privilege against self-incrimination, and the State bears the burden to show by a preponderance of the evidence that a confession was given knowingly and intelligently. *In re J.E.*, 285 Ill. App. 3d 965, 974 (1996), citing *People v. Anderson*, 276 Ill. App. 3d 1, 6 (1995). Procuring an incriminating statement by a juvenile in the absence of counsel requires great care to assure that the juvenile's statement was neither coerced, suggested, nor the product of fright or despair. *In re Lashun H.*, 284 Ill. App. 3d 545, 550 (1996), citing *People v. Prude*, 66 Ill. 2d 470, 476 (1977). In cases involving juveniles, courts must be particularly careful because " 'the coerciveness of a situation is thereby enhanced.' " *People v. Montanez*, 273 Ill. App. 3d 844, 850 (1995), quoting *People v. Cole*, 168 Ill. App. 3d 172, 179 (1988).

In determining whether a statement has been voluntarily given, our court looks at the "totality of the circumstances." *People v. Oaks*, 169 Ill. 2d 409, 451 (1996). " 'The test of voluntariness is whether the statement was made freely, voluntarily and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time [she or] he confessed.' " *People v. Miller*, 173 Ill. 2d 167, 181 (1996), quoting *People v. Clark*, 114 Ill. 2d 450, 457 (1986). Factors to consider include the age, education, and intelligence of the accused, the duration of questioning, and whether the accused was informed of her or his constitutional rights or was subjected to any physical punishment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 36 L. Ed. 2d 854, 862, 93 S. Ct. 2041, 2047 (1973); *People v. Martin*, 102 Ill. 2d 412, 427 (1984). Other relevant individual aspects include emotional characteristics, previous experience with the criminal justice system, and whether the confession was induced by police deception. *People v. MacFarland*, 228 Ill. App. 3d 107, 117 (1992). Relevant factors pertaining to the nature of the interrogation include whether the defendant was subjected to physical punishment, offers of leniency, other offers or promises to induce a confession, falsely aroused sympathy, prior refusals to answer questions, and whether defendant was informed of her or his constitutional rights. *MacFarland*, 228 Ill. App. 3d at 117.

In cases involving juveniles, additional factors must be considered, such as the time of day and the presence of a parent or other adult concerned about the juvenile's welfare. *In re Lashun H.*, 284 Ill. App. 3d at 551, citing *People v. Brown*, 235 Ill. App. 3d 479 (1992). The disposition does not rest on one fact alone; the question must be answered based on the circumstances of each case. *Brown v. Illinois*, 422 U.S. 590, 603, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261 (1975); *People v. Melock*, 149 Ill. 2d 423, 447-48 (1992). We note that, in

reviewing the trial court's decision, we may consider the entire record, including trial testimony. *People v. Gilliam*, 172 Ill. 2d 484, 501 (1996), citing *People v. Stewart*, 104 Ill. 2d 463, 480 (1984). We will not disturb a finding by the trial court denying a motion to suppress a statement unless its finding is contrary to the manifest weight of the evidence. *People v. Pico*, 287 Ill. App. 3d 607, 612-13 (1997); see also *In re Lashun H.*, 284 Ill. App. 3d at 551, citing *People v. Davis*, 97 Ill. 2d 1 (1983).

■ The presence or absence of a parent is a factor to consider when determining the voluntariness of a confession; however, there is no *per se* rule that a parent or guardian be present. *People v. Gardner*, 282 Ill. App. 3d 209, 218 (1996). However, if parents, guardians, or concerned adults indicate an interest by their presence, then they should be allowed to confer with that child *before* any questioning occurs. *In re V.L.T.*, 292 Ill. App. 3d 728, 737 (1997); *In re J.E.*, 285 Ill. App. 3d at 974-75; *In re S.D.S.*, 103 Ill. App. 3d 1008, 1012 (1982). Courts have held that conduct by law enforcement personnel that frustrates parents' attempts to confer with their child prior to or during questioning is a significant factor in determining whether a confession was given voluntarily. *In re Lashun H.*, 284 Ill. App. 3d at 553.

In *People v. Knox*, 186 Ill. App. 3d 808 (1989), the defendant, a juvenile, was arrested at his home at 9:40 p.m. Approximately one-half hour later, the defendant's mother arrived at the police station. She identified herself at the front desk and was told to wait. At midnight, she was informed that the defendant had already confessed and she should go home.

The trial court denied the defendant's motion to suppress, but the reviewing court reversed, finding that the police had "contributed significantly to eliminating any opportunity defendant had from speaking to his mother at the police station." *Knox*, 186 Ill. App. 3d at 813. The *Knox* court stated:

> "We do not believe such conduct by police is consistent with the great care required where a juvenile's incriminating statement is received. At worst, the police purposefully precluded defendant's mother from contact with defendant by neglecting to see if defendant's mother had arrived until after such time as defendant had completed his confession. At best, the police simply subjected defendant to the same routine questioning of a criminal suspect without special regard for his youth. Either scenario is impermissible and casts some doubt over the voluntariness of defendant's statement." *Knox*, 186 Ill. App. 3d at 814.

We find *In re Lashun H.*, 284 Ill. App. 3d 545 (1996), persuasive.

In that case, the respondent, a 14-year-old male, was charged with first-degree murder. The day after the shooting, police officers took the respondent to the station for questioning, which began at 3:30 a.m. At approximately 6:15 a.m., the respondent made an incriminating statement. At a pretrial hearing, the respondent sought to have his statement suppressed, which the trial court denied. Subsequently, the trial court adjudicated respondent a delinquent for first-degree murder. The reviewing court reversed, holding that the respondent's confession was not voluntary. The reviewing court noted that the respondent was never requested to sign a formal waiver of his rights, his confession was never reduced to writing, and it was never given to the respondent to review and sign. The respondent's mother was prevented from seeing him until after he confessed. When the respondent was finally allowed an opportunity to confer with his mother, he told her he was not the shooter. The reviewing court combined those factors, including the coercive nature of the encounter and the respondent's youth, considered the respondent's learning disability and minimal prior contact with the juvenile justice system, and concluded that the respondent's confession was not voluntarily given. *In re Lashun H.*, 284 Ill. App. 3d at 552-55.

We turn now to the particular circumstances surrounding respondent's statement. Initially, we note that respondent's statement contains the necessary statutory language, satisfying the elements of the offense of criminal sexual assault (see 720 ILCS 5/12—13(a)(1) (West 1996)). We have reviewed the circumstances surrounding respondent's confession and conclude that the trial court's determination that respondent's confession was voluntary is against the manifest weight of the evidence. The coercive nature of the juvenile respondent's encounter with the police began immediately at respondent's home when Weaver took respondent into custody and pulled respondent's belt off. It continued by placing respondent in handcuffs and transporting him in a squad car to the station, rather than allowing respondent's parents to drive respondent to the station or allowing respondent's mother the opportunity to ride with him. The record reflects that, in less than 10 minutes' time, respondent was brought in to the station, was read his *Miranda* warnings, was read the constitutional waiver, was read two additional juvenile warnings, which respondent also purportedly read before initialing each warning paragraph, signing, dating, and timing the sheets, without any apparent concern to the whereabouts of his parents, whether they were notified, whether they were coming in to the station, or whether they wished to confer with their child before he would be subjected to police interrogation.

Upon arrival at the station, respondent's parents immediately notified an officer of their presence and their desire to confer with their child. The police officer's response to them was to sit and wait, which they did, for more than one hour. Even after the wait, they still were not allowed to see their child for the remainder of the evening.

The State argues that a youth officer was present the entire time during the respondent's interrogation. *Contra Knox*, 186 Ill. App. 3d 808. The presence of a youth officer is a significant factor in demonstrating voluntariness. See *In re Lashun H.*, 284 Ill. App. 3d at 557. However, the presence of a youth officer does not *per se* make a juvenile's confession voluntary. *Gardner*, 282 Ill. App. 3d at 218. In the present case, Mueller, the youth officer, was present; however, the record is silent of indicia on the part of the youth officer affirmatively protecting respondent's rights.

The State contends that respondent did not want his parents present, that he read and signed the *Miranda* warnings, and wrote his statement, all on his own accord. The State contends that when respondent declared "it's none of their fucking business," it meant that respondent did not wish to consult with his parents. The State cites two out-of-state cases for authority for the proposition that a confession should not be deemed involuntary where the parents are not present at an interrogation wholly or partly because the juvenile does not desire them to be present. While a juvenile's purported desire not to have her or his parents present during an interrogation is certainly a factor in determining voluntariness, it is no more than that, one factor, of the many our court reviews in considering the totality of the circumstances.

We believe that the police read too much into respondent's statement. Simply because respondent said it was none of his parents' business does not necessarily mean he did not wish to consult with them. It does, however, support the proposition that the police subjected respondent to the same routine interrogation of an adult suspect without any special regard for his youth. See *Knox*, 186 Ill. App. 3d at 814. Further, the State's interpretation blatantly disregards the interest of the parents in wishing to confer with their child before questioning. See *In re V.L.T.*, 292 Ill. App. 3d 728 (1997); *In re J.E.*, 285 Ill. App. 3d 965 (1996); *In re S.D.S.*, 103 Ill. App. 3d 1008 (1982). We determine that the police in this case clearly frustrated respondent's parents' attempts to confer with their child prior to or during questioning. Moreover, we hold that when a juvenile's parents are present, request to confer with their child, and are effectively refused by the law enforcement authorities, the presumption arises that the juvenile's will is overborne.

Respondent in this case was even more susceptible than the general population of 16-year-olds because of his learning disabilities. Dr. Carr, who had been treating respondent for approximately eight months prior to the incident, diagnosed respondent with ADHD and prescribed various psychotropic medications to respondent. Approximately two months prior to the incident, respondent, on his own, ceased taking his antipsychotic medication and reduced his intake of antidepressant medication. The record reflects that respondent has attended special education classes for nearly all of his years of schooling. As a result of respondent's psychiatric disorders, combined with the withdrawal of the psychotropic medication, respondent's vulnerability should have been even more apparent. We note that evidence of limited mental capacity alone does not indicate that respondent was incapable of waiving his constitutional rights and making a voluntary confession. See *People v. Tackett*, 246 Ill. App. 3d 622, 626 (1993). However, it is another factor we consider under the totality of the circumstances.

Further, respondent's prior contacts with the police were minimal and not such that the intimidation inherent in this type of encounter would be lessened. This was respondent's first referral to juvenile court. Respondent had previous station adjustments, but station adjustments are merely verbal warnings from the police, occurring when a juvenile is brought into the police station, but later released when the police have decided not to refer the matter to juvenile court. See *People v. D.B.*, 202 Ill. App. 3d 194, 203 (1990). During these various station adjustments, respondent's parents, either alone or together, were present with respondent. On one occasion, the mother testified, she simply told respondent to sign the waiver, which he did. Thus, these prior experiences would not have given respondent the sophistication or insight of how to conduct himself while being interrogated by police in a criminal sexual assault case. To the contrary, respondent could have been led to believe that this occasion was no different from the other times he was brought in, admonished, and released.

Based on the facts and circumstances presented, we find that the evidence clearly demonstrates that the trial court's finding was against the manifest weight of the evidence. Therefore, we determine that respondent's statement was not voluntary, and the adjudication of delinquency must be reversed.

■ Finally, respondent contends that he was not found guilty beyond a reasonable doubt. We have reviewed the entire adjudication hearing record. In considering the sufficiency of the evidence, we ask only whether all the evidence, viewed most favorably to the prosecu-

tion, is sufficient to convince any rational trier of fact that the elements of the offense have been proved beyond a reasonable doubt. *People v. Green*, 288 Ill. App. 3d 402, 405 (1997). We do not reevaluate the witnesses' credibility or the weight to be accorded the evidence. *Green*, 288 Ill. App. 3d at 405. Thus, while there may be disagreements concerning the timeliness of the report of the conduct and the issue of consent, we cannot find that the evidence here was insufficient to support the offense of criminal sexual assault. Our holding does not, however, constitute an implication as to respondent's guilt or innocence which would be binding on retrial, but is intended only to protect respondent from the risk of double jeopardy. See *People v. Taylor*, 76 Ill. 2d 289 (1979). This cause is remanded for a new adjudication hearing with directions to suppress respondent's statement.

The order of the circuit court of Lake County is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

GEIGER, P.J., and McLAREN, J., concur.